# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 17 C 7790 |
| | ) |
| A1 JANITORIAL SUPPLY CORP., | ) Judge John Z. Lee |
| CENTURY MANUFACTURING CORP., | ) |
| COMMERCIAL MAINTENANCE | ) |
| CHEMICAL CORP, GLOBAL DIRECT | ) |
| RESOURCES, INC., ERIC STERNBERG, | ) |
| and MATTHEW STERNBERG, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Two years ago, the Federal Trade Commission ("FTC") filed suit against Defendants Eric and Matthew Sternberg ("the Sternbergs") along with A1 Janitorial Supply Corp., Century Manufacturing Corp., Commercial Maintenance Chemical Corp., and Global Direct Resources, Inc. ("the Company Defendants"). At the time, the Court appointed a Receiver, Gregg Szilagyi ("the Receiver"), to assume control of the Company Defendants. Now that the underlying dispute has been resolved, the Receiver, as well as his lawyers and accountants, have filed applications requesting that the Court approve their fees and expenses [332], [333], [334]. For the reasons below, those applications are granted in part and denied in part.

## Background

The Receiver has been involved with this case since the beginning. Within days of the FTC's filing of the complaint, Compl., ECF No. 1, the Court entered a temporary restraining order ("TRO") freezing the Defendants' assets and appointing the Receiver to administer them. TRO at 16–20, ECF No. 16. Not long after, the Court approved a stipulated preliminary injunction that appointed the Receiver for the pendency of this action. Stipulated Preliminary Injunction Order ("PI Order"), at 17, ECF No. 45.

Over the past two years, the Receiver has completed numerous tasks, including:

- Hiring attorneys from Fox Rothschild, LLC ("Fox Rothschild") and accountants from Cendrowski Corporate Advisors, LLC ("CCA") to assist him. *See* 11/21/17 Order, ECF No. 41.

- Securing the premises of the Company Defendants, ending their operations, and monitoring their compliance with the asset freeze. *See* Receiver's Mot. Incorporate ¶ 9, ECF No. 249.

- Assuming control of Ecoclean Solutions, a non-party organization owned by the Sternbergs. *See* 9/21/18 Order at 2, ECF No. 225.

- Negotiating the Ecoclean Agreement, a contract that permitted Ecoclean to remain operational and continue doing business. Ecoclean Agreement ¶¶ 1–2, ECF No. 249-3.

Ultimately, the FTC and Defendants settled this dispute. *See* Stipulated Final Judgment and Order at 1, ECF No. 340. With the litigation complete, the Receiver, his lawyers, and his accountants have submitted applications asking this Court to approve their fees and expenses. *See* Fox Rothschild's Fee Application ("Fox Fee App."), ECF No. 332; Receiver's Fee Application ("Rec. Fee App."), ECF No. 333; Cendrowski Corporate Advisors' Fee Application ("CCA Fee App."), ECF No. 334. The Court's only remaining task is to rule on those applications.

## **Legal Standard**

District courts enjoy broad discretion in determining the amount of a fee award. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). The key question is "what the [professionals] would receive if [they] were selling [their] services in the market rather than being paid by court order." *Matter of Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 568–69 (7th Cir. 1992). "Although there is no precise formula for determining a reasonable fee, the court generally begins by multiplying the hourly rate by the hours worked to calculate a 'lodestar' amount." *Schlacher v. Law Offices of Phillip J. Rotche & Assocs., P.C.*, 574 F.3d 852, 856 (7th Cir. 2009). The court may adjust that figure to reflect various factors including "the complexity of problems faced, the benefits to the receivership estate, the quality of the work performed, and the time records presented." *U.S. S.E.C. v. Wealth Mgmt. LLC*, No. 09-C-506, 2011 WL 4479518, at *1 (E.D. Wis. Sept. 26, 2011).

Most of the time, "there is a strong presumption that the lodestar figure is reasonable." *Perdue v. Kenny A.*, 559 U.S. 542, 554 (2010). To benefit from that

presumption, the fee application must contain "sufficient descriptive detail." *Fed. Trade Comm'n v. Cent. Coast Nutraceuticals, Inc.*, No. 10 C 4931, 2011 WL 2135208, at *1 (N.D. Ill. May 25, 2011) (citation omitted). To that end, applicants should "describe[e] the services rendered . . . [and] explain what results were obtained." *Fed. Trade Comm'n v. Capital Acquisitions & Mgmt. Corp.*, No. 04 C 7781, 2005 WL 3676529, at *3–4 (N.D. Ill. Aug. 26, 2005). In the same vein, the "party objecting to a fee application may not do so based on the general proposition that the fee sought is simply too much." *Id.* at *4. Rather, "[t]he objector must, at some point, identify any allegedly improper, insufficient, or excessive entries and direct the court's attention to them." *Id.*

## Analysis

Defendants contest the vast majority—$551,329.11 of $629,023.52—of the fees that the Receiver and his professionals request. Defs.' Resp. Appl. Final Approval ("Defs.' Resp.") at 2, ECF No. 344. Before ruling on the Defendants' objections, the Court addresses a threshold matter. Having reviewed the applications submitted by the Receiver and Fox Rothschild, the Court finds that they contain "sufficient detail" to merit a presumption of reasonableness. *See Cent. Coast*, 2011 WL 2135208, at *1; *Capital Acquisitions*, 2005 WL 3676529, at *3, *Thorncreek Apartments III, LLC v. Mick*, 886 F.3d 626, 638 (7th Cir. 2018) (describing "the lodestar figure" as "presumptively reasonable") (citing *Perdue*, 559 U.S. at 553–54).[1] As a result, the

---

[1] The Defendants' third objection focuses on CCA's documentation. So the Court discusses the sufficiency of CCA's time entries in the context of that objection. *See infra* Analysis, Sec. III.

4

Defendants bear the burden of demonstrating that specific entries within those applications are unreasonable.

Although Defendants wisely devote most of their firepower to disputing specific categories of fees, they also level two blanket objections. First, they criticize the Receiver and his professionals for requesting $629,023.52 in fees and expenses when the Receivership Estate holds only $58,000 in assets. Defs.' Resp. at 5. But a reasonable fee application is not necessarily proportional to the size of the estate. *See Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994) ("Even though a receiver may not have increased . . . the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation.") (citation omitted). So, while a small estate may sometimes suggest that a large fee application is unreasonable, the only way to know for sure is by examining specific time entries.

Second, Defendants spend pages arguing that "the Receiver and his professionals directly caused the Receivership to lose significant assets, as well as caused additional damages to a non-party."[2] *Id.* at 6; *see also id.* at 3–11. But objectors have an obligation to "identify any allegedly improper, insufficient, or excessive entries" as specifically as they can. *Capital Acquisitions*, 2005 WL 3676529, at *4. Because the Defendants do not identify any entries—or even categories of

---

[2] Defendants also request that the Court: (1) reimburse them for rent on a certain property, which they claim should have been paid out of Receivership assets, and (2) compel the Receiver to return $128,400 that he allegedly removed from Ecoclean's bank account. Defs.' Resp. at 30. Because neither request relates to the proper amount of the fee award, the Court denies both requests.

5

entries—related to this objection, it cannot be sustained. With these threshold rulings in mind, the Court turns to the Defendants' specific objections.

## I. Ecoclean Solutions

By far the largest category of fees that the Defendants dispute relates to Ecoclean Solutions. In a prior order, the Court rejected the Receiver's contention that Ecoclean was an "affiliate" of Defendants or otherwise within the scope of the receivership's direct authority as defined in the PI Order. 9/21/18 Order at 5 (citing PI Order at 17). So, the Defendants say, it was unreasonable for the Receiver to dedicate substantial resources to monitoring Ecoclean. Defs.' Resp. at 14. In defending the reasonableness of their Ecoclean-related expenditures, the Receiver and his professionals advance three arguments.

To begin, the Receiver argues that Defendants' objection is improper because it does not identify any specific fees related to Ecoclean. Receiver's Reply at 7, ECF No. 347 (citing *Cont'l Ill.*, 962 F.2d at 570). But Defendants specifically highlight $48,374.56 of attorneys' fees and $171,279.50 in costs related to Ecoclean in their objection. Furthermore, the gist of Defendants' argument is that the Receiver lacked any authority to administer Ecoclean and, thus, should not be entitled to any fees that it incurred in doing so. Because they challenge an entire category of fees, the Court can rule on this objection without requiring Defendants to separately identify each and every Ecoclean-related entry in the fee applications.

Next, the Receiver submits that the asset freeze provision in the preliminary injunction order gave him power over Ecoclean. In that provision, the Court charged

6

the Receiver with "conserv[ing], hold[ing], and manag[ing] all Receivership assets." PI Order at 17. According to the Receiver, "[t]he vast majority of the assets that Defendants claim belong to Ecoclean are likely assets of the Receivership Defendants." Rec.'s Rep. at 8. However, in its September 21, 2018, order, the Court found that the Receiver had waived any argument that the asset freeze provision in the PI Order gave him power over Ecoclean. 9/21/18 Order at 5 n.4 (citing *Kerr v. Farrey*, 95 F.3d 472, 481 (7th Cir. 1996)). And even if this were not so, it is not at all clear from the record that the majority of Ecoclean's assets belong to the Defendants. In fact, the Receiver's own briefing identifies evidence that could support the opposite conclusion. *See* Receiver's Reply at 8.

Lastly, the Receiver points out that the PI Order permitted him to "enter into contracts . . . as advisable or necessary." PI Order at 19. In the Receiver's judgment, the Ecoclean Agreement was such an agreement, because it was necessary for the administration of the estate and benefited it. As a general matter, district courts enjoy broad discretion to appoint an equity receiver and to supervise the administration of the receivership. *See Pennant Mgmt., Inc. v. First Farmers Fin., LLC*, No. 14-cv-7581, 2015 WL 4511337, at *4 (N.D. Ill. July 24, 2015) (citing *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006)). That discretion includes the power to ratify a contract entered into by a receiver if it has been "helpful to the court and to the receivership estate." 2 R. Clark, *A Treatise on the Law and Practice of Receivers*, § 433.3 (3d ed. 1959) (citing *Mills v. Sherman*, 19 F.2d 114, 115–16 (6th Cir. 1927) (holding that a court may "adopt and approve [a contract entered

7

into by the receiver], rendering it retroactively effective")); *see also In re Indian Motorcycle Litig.*, 307 B.R. 7, 15 (Bankr. D. Mass. 2004) (treating *Law on Receivers* as "[t]he preeminent treatise" on that subject).

Here, the Ecoclean Agreement has indeed been helpful to the court and to the receivership estate. As the Receiver explained earlier in this litigation, the Ecoclean Agreement facilitated the entry of the stipulated preliminary injunction. *See* Receiver's Mot. Incorporate ¶¶ 11–13, ECF No. 249.[3] At the same time, the Ecoclean Agreement allowed Ecoclean—some portion of which qualified as an asset of the Sternbergs—to recommence its business. This was in the interest of the Sternbergs, who wished to maintain a profitable business despite the remainder of their businesses being shut down. It was also in the interest of the receivership estate, as the Ecoclean Agreement provided that Ecoclean would operate as a funding source for the receivership, ensuring payment of the Receivership Defendants' liabilities. For these reasons, the Court finds that the Receiver's decision to enter into the Ecoclean Agreement was "advisable or necessary," and the Receiver is entitled to recover reasonable fees related to his management of Ecoclean.[4]

---

[3] Defendants were given an opportunity to file an opposition to the Receiver's motion and did so, addressing the Receiver's arguments. Defs.' Resp. Mot. Incorporate, ECF No. 261. The parties then entered into the stipulated consent judgment, obviating the need for the Court to rule on the motion.

[4] As an aside, the Court notes that it has jurisdiction over Ecoclean by virtue of its contract with the Receiver. *See Fed. Deposit Ins. Co. v. Bernstein*, 786 F. Supp. 170, 178 (E.D.N.Y. 1992) (observing that an entity that contracts with a receiver on matters affecting the receivership becomes a "quasi-party" to the case "and subjects himself for the purposes of the contract to the orders of the court"); *In re F.W. Koenecke & Sons, Inc.*, 369 F. Supp. 558, 561 (N.D. Ill. 1973) (same); *In re Hollingsworth & Whitney Co.*, 242 F. 753, 756 (1st Cir. 1917) (same).

In two footnotes, Defendants raise additional objections to the Receiver's Ecoclean-related fees. At the outset, the Court notes that it is rarely proper to present new substantive arguments in footnotes. *See Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments . . . are waived."). In any event, even if Defendants had developed those arguments more fully, both would fail.

For one thing, Defendants dispute $2,632.50 billed by a Fox Rothschild associate, who attended an all-day meeting alongside a more senior lawyer from that firm. Def.'s Resp. at 16 n.18. But, as the Seventh Circuit has recognized, "multiple lawyers can lead to a more cost-efficient allocation of work." *Gautreaux v. Chicago Hous. Auth.*, 491 F.3d 649, 661 (7th Cir. 2007). Here, Defendants have failed to identify any specific reasons why the additional staffing was not necessary.

Defendants also criticize the Receiver for using block billing. Defs.' Resp. at 16 n.19. While that practice is disfavored, *Samirah v. Lynch*, No. 03-cv-1298, 2015 WL 3524790, at *4 (N.D. Ill. June 1, 2015), it is not prohibited. *Farfaras v. Citizens Bank & Tr. of Chi.*, 433 F.3d 558, 569 (7th Cir. 2006). Having reviewed the specific entries that Defendants criticize, the Court concludes based on this record that they are sufficiently detailed to support the Receiver's petition.

## II. Discovery on Behalf of the FTC

Next, Defendants assert that the Receivership performed unnecessary work at the FTC's behest. Defs.' Resp. at 17. As they point out, the Receiver and his lawyers repeatedly sought phone and email records relating to Defendants' conduct. In Defendants' view, those efforts contributed little to the Receivership Estate. *Id.* at 17–18.

9

But aiding the FTC was part of the Receiver's mission. Even after he shut down the Company Defendants, the Receiver had a duty to investigate their financial condition and to cooperate with the FTC in doing so. *See* TRO at 20 (directing the Receiver to scrutinize the "acts, conduct, property, assets, liabilities and financial condition of the Defendants."). Likewise, the preliminary injunction order instructed the Receiver to "[c]ooperate with reasonable requests for information or assistance from any state or federal law enforcement agency, including the FTC." PI Order at 21. Because the Receiver acted in accordance with this Court's order, Defendants' objection to this category of fees is overruled.

### III. CCA's Accounting Work

The Defendants' arguments with respect to CCA's fee application are a different story. As noted above, courts evaluate fee awards by considering (1) "the time records presented," (2) "the benefits to the receivership estate," and (3) "the quality of the work performed." *Wealth Mgmt. LLC*, 2011 WL 4479518, at *1.

Applying those factors here, the Court finds that a fee reduction is necessary. First, unlike the applications submitted by the Receiver and his lawyers, CCA's fee request lacks sufficient detail to trigger a presumption of reasonableness. Defs.' Resp. at 21–22. While some of CCA's entries offer enough information for the Court to evaluate, others do not.[5] Second, as to results, CCA identified no assets to add to

---

[5] For example, CCA submitted the following vague time entries: (1) "Extract reports from Sage accounting system; format excel files," CCA's Ex. A, CCA Invoices at 24, at ECF No. 334-1, (2) "Review motions," *id.* at 31, and, (3) "Discussions re: calculation of net income." *id.* at 44.

10

the receivership estate. Defs.' Resp. at 13. It is true that CCA "confirm[ed] that the Receivership Entities . . . [we]re integrated and intertwined." Rec.'s Reply at 14. But the Court harbors some doubt that hundreds of professional accounting hours were necessary to verify that fact. Third, as to quality, the incomplete time-keeping records and the substantial amount of time that was expended when compared to the limited financial benefits to the estate raises questions regarding the work's overall quality.

Mindful of the Seventh Circuit's warning that district courts "may not 'eyeball' and decrease the fee by an arbitrary percentage," the Court has carefully reviewed CCA's application. *Schlacher*, 574 F.3d at 857. Given that approximately one of every five of the CCA's time entries lacks sufficient detail, the Court finds that a 20% reduction is appropriate. *See Cent. Coast*, 2011 WL 2135208, at *2 ("[C]ourts have endorsed percentage cuts as a practical means of trimming fat from a fee application.").

## IV. Immediate Access to the Defendants' Premises

In granting the TRO, the Court directed the Receiver to "[u]se any means necessary to take possession of and to secure all areas of the business premises of the Receivership Defendants." TRO Order at 18. To that end, the Receiver, along with FTC personnel, members of the U.S. Postal Inspection service, two attorneys, and an accountant traveled to the Defendants' New York offices. Defs.' Resp. at 23. During

11

that visit, the Receiver's team closed the offices, sent employees home, changed the locks, and reviewed documents to identify receivership assets. Rec.'s App. at 31.

Echoing one of their earlier objections, Defendants fault the Receiver for bringing a second attorney and an accountant with him when he secured their offices. Defs.' Resp. at 23. But, as the Receiver observes, his team had to collect documents from three different offices in a short period of time. Rec.'s Reply at 15; *see Kurowski v. Krajewski*, 848 F.2d 767, 776 (7th Cir. 1988) ("The use of two (or more) lawyers . . . may well reduce the total expenditures by taking advantage of the division of labor."). Accordingly, this objection falls short.

## V. The First Report

Early in 2018, the Receiver submitted a "First Report" summarizing what he and his team accomplished during the first six months of the Receivership. Receiver's 1st Report, ECF No. 139. The $17,000 that the Receiver and his attorneys spent preparing that Report was excessive, Defendants insist. Defs.' Resp. at 24. The Court disagrees.

First, Defendants make much of the fact that "the bulk of the discussion of the [First Report] discussed matters involving Ecoclean." Defs.' Resp. at 24. But, as noted above, it was proper for the Receiver to evaluate Ecoclean and its relationship to the estate.

Next, the Defendants contend that the Report was unnecessary because "the Corporate Defendants . . . [had already been] shuttered." *Id*. Again, the Receiver

12

reasonably continued some activities—such as identifying the Company Defendants' assets—even after suspending their operations.

As a last resort, the Defendants stress that Magistrate Judge Weisman declined to approve the First Report. That is true, but says little about whether the time and effort that the Receiver took to prepare the Report was reasonable. *Smith v. Rosebud Farm, Inc.*, 2018 WL 4030591, at *6 (N.D. Ill. Aug. 23, 2018) ("Whether a motion . . . is granted or denied is irrelevant to the recoverability of fees for time spent on the motion.") (citing *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 90 F.3d 1307, 1314 (7th Cir. 1996)).

For these reasons, Defendants have failed to rebut the presumption that the fees relating to the First Report are reasonable.

## VI. The Receiver's Alleged Mistakes

Additionally, Defendants maintain that the Receiver should not be permitted to collect fees related to two supposed mistakes. First, Defendants suggest that the Receiver's attorneys mistakenly stopped Matthew Sternberg from receiving personal mail. Defs.' Resp. at 25. But the Receiver attributes that mistake to errant postal workers, not his lawyers. Rec.'s Reply at 16. Neither the Receiver nor the Defendants produce any evidence to resolve this factual dispute. Nor does either party request an evidentiary hearing. *Id*. at 5 n.2. And, because the fee applications mostly raise questions of law, not fact, the Court declines to hold one of its own accord. *See United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 858 (9th Cir. 1992) ("Where factual questions not readily ascertainable from the declarations of

13

witnesses or questions of credibility *predominate*, the district court should hear oral testimony.") (emphasis added). Because the Receiver's requests enjoy a presumption of reasonableness, and because the Defendants have failed to rebut that presumption, the Court denies this objection.

Second, the Defendants attack the Receiver for refusing to deposit checks written by their customers. Defs.' Resp. at 25. Specifically, they would prefer not to pay the fees that the Receiver and his lawyers accumulated while "considering whether to cash [those] checks." *Id*. at 26; *see also* Defs.' Ex. B, Customer Decls., ECF No. 344-2. But the preliminary injunction prohibited the Receiver from collecting money from victims of the Defendants' unfair or deceptive practices. PI Order at 2. As such, the Receiver had a duty to investigate before he cashed those checks. Thus, the Court overrules this objection as well.

## VII. Travel Time

The Receiver and his professionals request half their normal hourly rates as compensation for travel time. For two reasons, Defendants urge the Court not to approve those fees. At the outset, they observe that the Receiver could have hired New York-based attorneys and accountants, rather than flying in his Chicago-based team. But hiring New York-based professionals would not necessarily have been cost-effective. If anything, retaining separate teams in two cities would have been more expensive, not less. *See, e.g., Cent. Coast*, 2011 WL 2135208, at *1 (refusing to require a Receiver to employ professionals in both Chicago and Arizona).

14

Defendants also warn that the time entries do not show what work, if any, the Receiver and his professionals accomplished while traveling. Yet courts typically award "full compensation for an attorney's time spent in travel" regardless of whether that attorney completed any additional tasks during the journey. *Ruehman v. Vill. of Palos Park*, No. 91 C 8355, 1997 WL 187320, at *6 (N.D. Ill. Apr. 11, 1997). Accordingly, the Court declines to reject the fee applications to the extent that they seek reimbursement for travel time.

## VIII. Preparing Fee Applications

Building on their earlier arguments, Defendants insist that because "of the repeated mistakes and unauthorized and improper actions taken by the Receiver and his professionals," the Court should refuse to grant any fees related to preparing fee applications. Defs.' Resp. at 27. This objection is sustained in part.

First off, the Court disagrees with Defendant's characterization of the Receiver's conduct, which the Court has found to be reasonable for the reasons already stated. That said, the Court agrees with Defendants that some reduction is appropriate for this category of fees. For the most part, courts restrict compensation for drafting fee petitions to between 3% and 5% of the total fee application. *In re Stainless Sales Corp.*, 583 B.R. 717, 731 (Bankr. N.D. Ill. 2018) ("Courts have applied limits in the range of 3% to 5% in this regard.") (citations omitted). In deciding how much to award, courts ask whether the amount is "excessive, redundant, or otherwise unnecessary," the same factors they apply when considering any other request for

attorney's fees. *Hensley*, 461 U.S. at 434; *see In re Pettibone Corp.*, 74 B.R. 293, 304 (Bankr. N.D. Ill. 1987).

Here, all three applications involve relatively simple legal issues. What is more, professionals typically do not charge their clients for simply collecting and itemizing their bills. Yet the Receiver and his professionals request 5.6% of the total fee amount in compensation for preparing their fee applications. Given the relatively straightforward nature of those applications, the Court finds that amount to be excessive. *See Hensley*, 41 U.S. at 434. Instead, the Court will permit the applicants to recover 3% of the total fee amount allowed, which is the low end of the normal range.

## IX. Actual Expenses

Defendants focus their final arguments on the Receiver's request for expenses. To the extent that the Defendants contest all expenses without "precisely identif[ying] the portions of the billing statements to which [they] object," this objection is overruled. *U.S.A. v. CDW–Government, Inc.*, No. 305CV00033DRHPMF, 2013 WL 11267176, at *9 (S.D. Ill. May 17, 2013). To the extent that the Defendants dispute specific expenses, the Court addresses each of their five objections in turn.

First, Defendants point out that CCA has billed $1,127.50 for a technology access fee. Attempting to justify that expense, CCA explains that it relates "to the server that hosts Defendants' financial information for CCA's analysis." Rec.'s Reply at 20. Still, CCA has failed to offer any detail about that server, the vendor, or why

the payments were necessary.  As a result, the Court declines to require payment of this expense.

Second, Defendants complain that Fox Rothschild has failed to adequately document $813.25 in Federal Express and $95 in Messenger costs.  The Court agrees.  Though Fox Rothchild lists the date of each shipping expense, its documentation fails to describe how each charge relates to this case.  For that reason, the Court will not require payment of this expense.

Third, Defendants dispute the Receiver's request for reimbursement of $6,703.75 in "Security/Monitoring Services" and $1,202.48 for "B&B Lock."  As to the monitoring service, the Receiver's invoice reveals that these expenses relate to securing the Defendants' premises.  Receiver's Ex. A, Invoices Supporting Rec.'s Fee App. ("Rec.'s Invoices") at 3, ECF No. 333-1.  As to the locksmith, the Receiver states that he was employed to "change [the] locks on all [the Defendants'] facilities."  Rec.'s Invoices at 4.  Because the TRO directed the Receiver to "take possession of and secure all areas of the business premises," the Court concludes that both expenses were reasonable.  TRO Order at 18.

Fourth, Defendants contest CCA's request for $218.06 for "Meals and Entertainment."  Defs.' Resp. at 28.  Given that those charges coincide with the accountants' trip to New York, the Court treats this as a reasonable travel expense.  *See* Invoice for CCA's Fee App. at 7, ECF No. 334-1; *In re Cont'l Ill. Sec. Litig.*, 572 F. Supp. 931, 934 (N.D. Ill. 1983) (concluding that "hotel accommodations and meals" count as a reasonable expense when the travel is necessary).

17

Fifth, Defendants warn that Fox Rothschild has billed more than $6,000 for WestLaw and Pacer research. Courts disagree about whether it is appropriate to award such costs. *Compare In re Meltzer*, 535 B.R. 803, 815 (N.D. Ill. Bankr. Aug. 25, 2015) (collecting cases that declined to reimburse WestLaw expenses), *with In re Fibermark*, 349 B.R. 385, 399 (N.D. Ill. Bankr. Sept. 6, 2006) (collecting cases that approved those expenses). The Seventh Circuit has come out in favor of permitting fee applicants to bill for research costs. *In re Cont'l Ill. Sec. Litig.*, 962 F.2d at 570. So, this Court does as well.

Table 1, below, summarizes the Court's rulings related to the Receiver and his professionals' fee applications.

**Table 1: Fee Awards**

|  | *Receiver* | *Fox Rothschild* | *CCA* |
|---|---|---|---|
| *Fees Requested* | $99,123.75 | $317,328.98 | $182,484.45 |
| *Deductions* | $0 | $19,527.47 | $36,496.89 |
| *Fees Awarded* | $99,123.75 | $297,801.51[6] | $145,987.56 |
|  |  |  |  |
| *Expenses Requested* | $12,296.31 | $14,842.02 | $2,948.01 |
| *Deductions* | $0 | $908.25 | $1,127.50 |
| *Expenses Awarded* | $12,296.31 | $13,933.77 | $1,821.51 |
|  |  |  |  |
| *Total Amount Awarded* | $111,420.06 | $311,735.28 | $147,809.07 |
|  |  |  |  |
| *Holdback Amount* | $59.960.24 | $246,572.31 | $146,646.15 |
| *Interim Payments* | $51,459.82 | $85,598.68 | $38,786.31 |
|  |  |  |  |
| *Payment Due*[7] | $59,960.24 | $226,136.60 | $109,022.76 |

---

[6] This deduction reflects the Court's ruling that Fox Rothschild may collect only 3% of the total award in fees related to preparing fee applications. The $297,801.51 figure represents Fox Rothschild's requested fees (317,328.98) minus the requested fee application amount (36,157.50) plus (16,630.03), which reflects 3% of the total fees and expenses awarded to all three applicants (554,334.38).

[7] This represents the total amount awarded minus the amount of interim payments.

19

## **Conclusion**

The fee applications submitted by the Receiver and his professionals are granted in part and denied in part. The Court trims those applications in three ways. First, CCA's fee is reduced by 20% to reflect deficiencies in the results they produced and the documentation they filed. Second, Fox Rothschild may recover only 3% of the total award as compensation for the time they spent preparing fee applications. Third, CCA and Fox Rothschild may not claim certain expenses, as detailed above. The Court approves the fee applications in all other respects.

**IT IS SO ORDERED.**  ENTERED:  2/24/20

_____
**JOHN Z. LEE**
**United States District Judge**